PATRICK D. ROBBINS (CABN 152288)
Attorney for the United States

MATTHEW YELOVICH (NYBN 4897013)
Acting Chief, Criminal Division

DAVID J. WARD (CABN 239504)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7230
    david.ward@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR 21-00192 WHO |
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE UNDER U.S.S.G. § 5K1.1 |
| v. | |
| WILLIAM GILMARTIN III | Sentencing Date: January 11, 2024 |
| Defendant. | Time: 1:30 p.m.<br>Judge: Hon. William H. Orrick |

## I. INTRODUCTION

Defendant William Gilmartin comes before this Court for sentencing after pleading guilty to participating in a six-year sprawling honest services fraud conspiracy with his business partners, Alan Varela and Balmore Hernandez. The trio corruptly funneled over $127,000 in bribes to Mohammed Nuru, then the director of the San Francisco Department of Public Works ("DPW"). This was base but simple corruption: Gilmartin and his cohorts paid Nuru cash, bought him lavish meals, paid for construction work on his vacation home, and even bought him a $40,000 John Deere tractor. In return, Nuru promised to use his position as a high-ranking city official to help award their business venture a multi-million dollar contract to operate an asphalt recycling plant on Port of San Francisco land and

U.S. SENTENCING MEMO           1
CR 21-00192 WHO

other contracts and business with the City of San Francisco.

In mitigation, within months of being charged, Gilmartin agreed to plead guilty and cooperate with the government. He did so, and he has provided substantial assistance. Given this, the government recommends that the Court grant the motion for a downward departure under § 5K1.1 of the U.S. Sentencing Guidelines, then further vary downward from the recommended Guidelines range and impose a sentence of eight months in custody, $100,000 fine, and one year of supervised release.

## II.     BACKGROUND

The facts of Gilmartin's crimes are detailed in the Criminal Complaint (*Dkt. 1*), Plea Agreement *(Dkt. 39)*, and the Presentence Report *(Dkt. 76)* filed in this case. In 2013, Gilmartin, Varela, and Hernandez set their eyes on a lucrative piece of potential business - a contract to build and operate a multi-million a year asphalt recycling plant on land owned by the Port of San Francisco. PSR ¶ 14. That contract would be overseen by the San Francisco Department of Public Works (DPW), headed at the time by Nuru. Gilmartin was Vice President of ProVen Management ("ProVen"), a Bay Area civil engineering and construction firm that specialized in large-scale infrastructure projects. PSR ¶ 9. Co-conspirator Varela was the founder and chief executive of ProVen. *Id.* ProVen was part of a joint venture seeking to win the asphalt recycling plant project and other city business.

The asphalt plant contract was supposed to awarded through a competitive bidding process, but Gilmartin and his conspirators instead sought a short-cut. Instead of competing fairly, they directed a stream of bribes to Nuru to influence Nuru to use his position to award their business venture the asphalt recycling plant contract. They showered Nuru with cash, meals, and other items of value. Gilmartin personally paid over $20,000 in meals for Nuru, helped to purchase $47,000 in windows for Nuru's vacation home, and with Varela and Hernandez, purchased and helped arrange the delivery and installation of construction materials to Nuru's vacation home. *Id.* ¶ 13. They also promised Nuru a share of the future profits from the asphalt plant venture, which they estimated would hundreds of thousands of dollars. *Id.* ¶ 14.

Nuru was an ideal target for this corruption. First, he had enormous influence over the City business and policy, including over the awarding of the asphalt recycling plant contract that Gilmartin and his co-conspirators coveted. But more significant, as is well known to this Court, Nuru was also

deeply corrupt, and repeatedly used his position of power to enrich himself and his friends and supporters.  His corrupt interactions with Gilmartin, Hernandez, and Varela were no different.  Throughout the period that Gilmartin and his co-conspirators were seeking the asphalt recycling plant contract, Nuru was demanding, and the conspirators were willingly paying, over a hundred thousand dollars in bribes, from cash to meals to free construction work and materials.

To effectuate the conspiracy, Gilmartin, Varela, and Hernandez began meeting with Nuru, often over expensive dinners, to convince him to use his position and influence to insure that ProVen Management was awarded the contract. *PSR* ¶ 14.  Nuru complied.  As the bidding process unfolded, Nuru repeatedly and covertly provided Gilmartin, Hernandez, and Varela, with internal, non-public information and documents about the bidding process.

For example, on September 16, 2014, Nuru forwarded from his work account to his personal email an internal email among DPW employees regarding an environmental assessment at the site of the proposed asphalt plant. *PSR* ¶ 17.  Nuru forwarded the information to Hernandez, who forwarded it on to Gilmartin, who responded: "*Thanks, I hope all our efforts pay off some day. It seems that it is close*." *Id.*  This practice continued into 2015.  On February 2, 2015, Nuru forwarded Gilmartin additional internal information about the asphalt plant. *Id.*  Gilmartin forwarded the information to a work colleague, writing: "*don't worry . . . this is set up for us to win*." *Id.*

On February 10, 2015, the Port of San Francisco issued a solicitation for bids for the asphalt plant, and on June 16, 2015, four proposals were submitted for consideration. *Id.* ¶¶ 20, 22.  Defendant Gilmartin and co-conspirators' joint venture, ProVen, was selected as the most responsive proposal. *Id.*  Following this, Gilmartin and ProVen entered into negotiations with DPW over the terms of the joint venture. *Id.*  During these negotiations with DPW, Gilmartin, Varela, and Hernandez continued to shower bribes on Nuru, who was overseeing and monitoring the negotiations.  As the negotiations over the asphalt plant contract heated up beginning in 2017, Gilmartin admits that he and the co-conspirators spent approximately $20,000 on meals with and for Nuru, often elaborate dinners at Central Park Bistro, a high-end restaurant in San Mateo. *Id.* ¶ 24.  Nuru then began demanding cash payments for his corrupt assistance. *Dkt. 32* (Balmore Hernandez Plea Agreement) Ex. A, ¶ 8  To appease Nuru, and as a partial payment, Gilmartin provided Hernandez with $25,000 in cash in a box, which Hernandez delivered to

Nuru. *Id.* Ex. A, ¶10. To cover their commitment, Gilmartin arranged for Hernandez to receive a consulting contract with another company under which Hernandez received $15,000 a month for seven months, with the understanding that Hernandez would divert some of these monies to pay for the labor and material that Gilmartin and Hernandez were providing for Nuru's ranch property. *Id.* Ex. A, ¶ 10.

Throughout the time period prior to Nuru's arrest, defendant Gilmartin, along with Hernandez and Varela continued to lavish gifts on Nuru. In one of the most egregious examples of corrupt excess, in February 2019, Hernandez and Varela coordinated the purchase and delivery of a $40,000 John Deere tractor to Nuru for his vacation ranch. *Dkt. 1.* (Criminal Complaint) ¶ 108. On February 13, 2019, the tractor was delivered to Nuru's ranch. *Id.* ¶ 109. Later that same day, Nuru texted a photo of the tractor being unloaded, with the tagline "*work begins at the ranch.*" *Id.* ¶ 112.

Two days later, Hernandez and Gilmartin again took Nuru to dinner at Central Park Bistro. *Id.* ¶ 116. The bill was $716.80. *Id.* According to intercepted phone conversations with Nuru, at the dinner and in phone calls afterwards, Nuru, Hernandez, and Gilmartin discussed the asphalt plant and how Nuru could help them resolve still ongoing negotiations with the Port and DPW. *Id.* ¶ 117. Gilmartin, Nuru, and their co-conspirators were still working to finalize the agreements with the Port and DPW when Nuru was arrested by the FBI on January 28, 2020.

### III.   GUIDELINES CALCULATION ANALYSIS

The government agrees with U.S. Probation's calculation of the U.S. Sentencing Guidelines, which are as follows:

    a.    Base Offense Level, U.S.S.G. §2C1.1(a)(2):    12

    b.    Specific offense characteristics under U.S.S.G. Ch. 2:

        The value of the payments or benefits received was between $95,000 and $150,000; U.S.S.G §2C1.1(b)(2); U.S.S.G. §2B1.1(b)(1)(E):    +8

        The offense involved a public official in a high-level or sensitive decision-making position. U.S.S.G. § 2C1.1(b)(3):    +4

    c.    Acceptance of Responsibility, U.S.S.G. § 3E1.1(a), (b):    - 3

    d.    Zero-Point Offender USSG Reduction. U.S.S.G. § 4C1.1(a)(2) - (a)10    - 2

    e.    Adjusted Offense Level:    19

## IV.    SENTENCING RECOMMENDATION

### A.    Legal Standard

The U.S. Sentencing Guidelines serve as "the starting point and initial benchmark" of any sentencing process, and are to be kept in mind throughout the process. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007). The overarching goal of sentencing, as set forth by Congress, is for the Court is to "impose a sentence sufficient, but not greater than necessary." *Carty*, 520 F.3d at 991. In accomplishing that goal, the Court should consider the factors set forth in 18 U.S.C. § 3553(a), to include:

> (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)    the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense
>
> (3)    the need for the sentence imposed to afford adequate deterrence to criminal conduct;
>
> (4)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

### B.    The Government's Recommended Sentence Vindicates the 18 U.S.C. §3553(a) Sentencing Factors

#### 1.    *The Facts and Circumstances and the Need For the Sentence to Reflect the Seriousness of the Offense*

This case arises out of a large-scale federal investigation into public corruption in the City of San Francisco that has exposed a deep current of corruption that ran through the City for many years.[1] It has resulted in over a dozen criminal convictions, including two convictions after jury trials. It is one of the worst public corruption scandals in San Francisco's history.[2]

---

[1] *See United States v. Mohammed Nuru*, 21-CR-0490 WHO; *United States v. Walter Wong*, 20-CR-0257 WHO; *United States v. Harlan Kelly*, 21-CR-0402 RS; *United States v. Nick Bovis*, 20-CR-0204 WHO; *United States v. Balmore Hernandez*, 20-CR-0353 WHO; *United States v. Alan Varela*, 21-CR-0192 WHO; *United States v. Florence Kong*, 20-CR-0354 WHO; *United States v. Sandra Zuniga*, 21-CR-0096 WHO. *United States v. Recology Inc.* 21-CR-0356 WHO, *United States v. Paul Giusti*, 21-CR-0294 WHO; *United States v. John Porter*, 22-CR-0270 WHO; *United States v. Zhang Li*, 23-CR-0220 WHO; *United States v. Z&L Properties*, 23-CR-0221 WHO.

[2] *See:* https://sfstandard.com/2023/12/25/biggest-san-francisco-political-scandals-sex-bribes-murder/; https://www.sfchronicle.com/opinion/openforum/article/sf-city-hall-corruption-18272032.php

Few types of cases implicate the second sentencing factor above – "the need … to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" – in the way that public corruption offenses do.  The Courts have repeatedly noted the harm wrought by public corruption schemes.  As Justice Clarence Thomas explained, bribery is the "perversion or destruction of integrity in the discharge of public duties." *Nixon v. Shrink Missouri Government*, 120 S. Ct. 897, 923 (J. Thomas, dissent), quoting 3 Oxford English Dictionary 974 (1989). Chief Justice William Rehnquist echoed the same sentiment in *Federal Election Commission v. National Conservative Political Action Committee*:, writing that "corruption is the subversion of the political process.  Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns.  The hallmark of corruption is the financial *quid pro quo*: dollars for political favors."  470 U.S. 485, 497 (1985).

While this was written by Chief Justice Rehnquist almost 40 years ago, it rings just as true today, and applies just as squarely to this case as it did then.  Defendant Gilmartin engaged in six years of steady, corrosive corruption, facilitating over $127,000 in bribes to Mohammed Nuru.  Gilmartin helped obtain and deliver a high-end tractor and other equipment to Nuru for his vacation home.  Gilmartin and Varela and Hernandez plied Nuru with lavish meals and drinks, with the bills running into the hundreds of dollars.  All so that Nuru would use his official position and power subvert the public bidding process and illegally steer millions in dollars in city contracts and business to Hernandez and his co-conspirators.

This was not a victimless crime. Gilmartin's crime was part of a corrupt endeavor that undermined what was supposed to be an open and fair bidding process.  The corruption of that process that unfairly cheated other legitimate bidders of a chance to gain city contracts.  It also left the City and County of San Francisco, and its taxpayers, with the losses that invariably come in the absence of an open and competitive bidding and contract awarding process.

  **2.**  ***The History and Characteristics of the Defendant***

William Gilmartin was given every opportunity for success.  He was raised in a stable, supporting family. *PSR* ¶¶ 51-54. He is married and has three children and seven grandchildren. *Id.* ¶ 55.  He has been employed as a high-ranking executive at ProVen Management since 2000, earning substantial income. *Id.* ¶¶ 65, 66.  Despite all these advantages, he allowed his greed and his lack of

moral compass to lead him to engage in a years-long criminal conspiracy to enrich himself and his partners.  He admits that this was wrong. More troubling, admits that he knew *at the time* it was wrong.  *PSR* ¶ 30 ("*I know that it's just wrong.  And not too deep inside, I knew it was wrong even at the time.*").

Given the circumstances of the offense, including the abject betrayal the betrayal of the public trust by Gilmartin, a substantial custody sentence is warranted.  The length and severity of that sentence, however, must be mitigated by Gilmartin's acceptance of responsibility, and his substantial assistance to the government in its public corruption investigations and prosecutions.

## V.     MOTION FOR DOWNWARD DEPARTURE UNDER U.S.S.G. 5K1.1

### a.  The Court Should Grant the Government's 5K1.1 Motion

"Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." U.S.S.G. § 5K1.1.  The Court may consider the following when determining the appropriate amount of the reduction; 1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered; 2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant; 3)  the nature and extent of the defendant's assistance; and 4) the timeliness of the defendant's assistance. U.S.S.G. § 5K1.1.

In this case, Gilmartin pled guilty nine months after initially being charged.  *PSR* ¶ 2.  He was the second of his direct co-conspirators, after Balmore Hernandez, to plead guilty.  Gilmartin met with the government on over half a dozen occasions in 2021 and 2022, providing substantial assistance to the government in its prosecution of Varela, Nuru, and others.  Additionally, Gilmartin provided information and had agreed to testify in the trial of Harlan Kelly.  While his testimony was ultimately not needed, the government nonetheless found Gilmartin to be credible and cooperative.

Overall, in the government's view, Gilmartin's cooperation meets the substantial assistance standard as detailed in § 5K1.1, and it warrants the imposition of a downward departure and a below-Guidelines sentence.

//

//

### b. The Government's Sentencing Recommendation Avoids Unwarranted Sentencing Disparities

A downward departure, along with a variance, to a sentence of eight months custody and one year of supervised release, will avoid unwarranted sentencing disparities among similarly-situated defendants. *See* 18 U.S.C. § 3553(a). While each case and each defendant must be judged independently, and understanding that the drawing comparisons in an attempt to avoid unwarranted sentencing disparities is challenging, the Court can and should look to several of the recent public corruption cases that have come before it in determining what sentence is appropriate here.

First and foremost, the Court should consider the sentences imposed on Gilmartin's two most similarly-situated two co-conspirators. Alan Varela was sentenced to 24 months imprisonment, below the recommended U.S. Guidelines of 37 to 46 months (without the benefit of the Zero-Point Offender reduction), and fined $127,000. *United States v. Alen Varela*, 21-CR-0192 WHO, *Dkt 52*. Varela, however, did not cooperate with the government.

Balmore Hernandez was sentenced to six months imprisonment, one year of supervised release, and was fined $100,000. *United States v. Balmore Hernandez*, 20-CR-00353 WHO, *Dkt. 79*. Hernandez, however, cooperated with the government prior to Gilmartin, thus providing more timely and valuable assistance to the government in its investigations.

While not as directly related, several other sentences the Court has imposed in these public corruption cases can provide a helpful benchmark as the Court considers what sentence to impose here.

Florence Kong, a wealthy business owner who pled guilty to bribing Nuru with a $36,000 Rolex, and meals and drinks, and then making false statements to the FBI when confronted, all to secure contracts from Nuru and DPW for her companies, was sentenced by the Court to 12 months and one day of imprisonment, three years of supervised release, and fined $95,000. *See Kong,* 21-CR-0354 WHO, Dkt. 40. Kong did not cooperate, and her Guidelines recommend a sentence of 24 - 30 months.

Former Recology executives John Porter and Paul Giusti were both sentenced to six months of home confinement. *United States v. John Porter*, 22-CR-00270; *United States v. Paul Giusti*, 21-CR-0294 WHO. Porter did not cooperate, while Giusti, who had greater culpability, did. For both Porter and Giusti, however, their bribes were made as part of their employment at Recology, and at times with

U.S. SENTENCING MEMORANDUM  8
CR 20-00192 WHO

the knowledge of others at Recology. And unlike Gilmartin, neither Porter nor Giusti personally profited from their corruption.

### c. Gilmartin's Offense Justifies a Significant Fine

Finally, as noted in the PSR, Gilmartin has significant assets, enough to support and justify a substantial criminal fine. Given that Gilmartin's crime appears to have been motivated by greed, despite already having accumulated substantial wealth, the government respectfully submits that a substantial fine is particularly appropriate here and would serve as just punishment. The government therefore recommends that the Court impose a fine of $100,000, the same fine that was imposed on co-conspirator Hernandez. Additionally, given Gilmartin's significant wealth, the government asks that the Court order the defendant to make payment of the fine within 60 days of imposition of judgment. Defendant Gilmartin has no objection to this payment schedule (though will argue for a lower fine).

## VI. CONCLUSION

For the foregoing reasons, the government recommends that the Court grant the government's motion for a downward departure under § 5K1.1, then further vary downward from the recommended U.S.S.Gs, and sentence defendant Gilmartin to eight months' imprisonment to be followed by three years of Supervised Release, and a $100,000 fine.

PATRICK D. ROBBINS
Attorney for the United States

Dated: January 4, 2024

/s/ David J. Ward
DAVID J. WARD
Assistant United States Attorney